Fantastic Industries, Inc.,

                Plaintiff,

– against –

Jacob Kryman and KCH Corporation,

                Defendants.

KORMAN, *J.*:

    Plaintiff Fantastic Industries, Inc. (Fantastic), a corporation owned by Shimshon Jalas, petitions for an order directing defendants Jacob Kryman and KCH Corporation (KCH) to arbitrate a business dispute. Jalas seeks to compel arbitration under an agreement that the parties signed in 2017. Kryman argues that there was no valid arbitration agreement or, if there was, that Jalas has waived his right to compel arbitration.

## BACKGROUND

    The dispute is the result of family business dealings gone awry. Jalas is Kryman's uncle, and both are members of a "close-knit community of Hasidic Jews." ECF No. 22 at 5. Jalas's corporation, Fantastic, is a distributor of household products and, until 2011, Kryman worked as its National Sales Manager. ECF No. 1 at 3. The complaint alleges that Fantastic fired Kryman because Jalas discovered

1

that he was selling goods to Fantastic customers for his own account and those of his companies, including KCH. *Id.* Jalas soon learned that KCH had also applied for and obtained trademark registrations that he contends properly belonged to Fantastic. *Id.* Kryman maintains that KCH is the rightful owner of the disputed marks and he counters that Jalas has infringed on the marks and stolen industry contacts, proprietary information, and trade secrets from KCH for the benefit of his own business.[1] ECF No. 21-9 at 2.

I review the history of this case because it is relevant to determining whether Jalas has waived its right to demand arbitration. In 2011, Kryman commenced the string of litigation and attempted arbitrations that led to this motion by seeking an injunction against Fantastic in state court, which the court denied. ECF No. 1 at 3–4. Soon after, Kryman obtained an *ikul* — the equivalent of an injunction — from a *beth din*[2] that purported to enjoin Jalas from using any of the disputed marks. ECF No. 21-9 at 3; ECF No. 21-11 at 4. Separately, Jalas filed an opposition to Kryman's

---

[1] For ease of reading I refer to plaintiff Fantastic by its owner's name, "Jalas," and defendants together as "Kryman."

[2] A *beth din* is "a rabbinical tribunal having authority to advise and pass upon matters of traditional Jewish law." *Avitzur v. Avitzur*, 58 N.Y.2d 108, 112 (1983). Some Jewish communities either prefer to — or believe themselves religiously bound to — resolve disputes between members by referring matters to arbitration at a *beth din* rather than exposing them in secular courts. *See* Ginnine Fried, Note, *The Collision of Church and State: A Primer to Beth Din Arbitration and the New York Secular Courts*, 31 Fordham Urb. L.J. 633, 641–42 (2004).

application before the Trademark Trial and Appeal Board (TTAB) contesting ownership of one of the disputed marks. ECF No. 21-2 at 2.

In 2012, the parties agreed to arbitrate before a *beth din* (1) whether Jalas could recover civil costs for the state court proceeding, and (2) whether Kryman's claims "ought not to be entertained in a Jewish court [because] he pursued [them] in a civil court." ECF No. 21-13 at 5. The parties agreed to discontinue the state action with prejudice because the claims were proceeding to arbitration. ECF No. 20-3 at 6. Kryman filed that discontinuance with the TTAB, and that proceeding was stayed as well. ECF No. 21-2 at 2. Between 2012 and 2019, Kryman repeatedly informed the TTAB that the action could remain stayed because arbitration "was ongoing under the auspices of a rabbinical court." ECF No. 21-2 at 1. No arbitration actually took place, and each party blames the other for that failure. *See* ECF No. 21-9 at 4; ECF No. 22-2 at 4.

The matter lay dormant until 2017, when Jalas served Kryman with a *hazmana* — the equivalent of a summons — to appear before a *beth din*. ECF No. 21-9 at 5. Kryman claims he was shocked by the summons, while Jalas responds that he renewed his attempts at arbitration because Amazon removed Fantastic's products from its platform in response to complaints from Kryman's attorneys. ECF No. 21-9 at 5; ECF No. 22-2 at 4. Jalas served two more summonses and threatened Kryman with a *seruv* (rabbinical contempt order) if he failed to appear for arbitration. *Id.*

3

Kryman eventually agreed to appear before a different *beth din*, Mechon L'Hoyroa, to "get Jalas off [his] back" and avoid the issuance of a *seruv*. ECF No. 21-9 at 5. Kryman sent Jalas a signed electronic copy of a standard arbitration agreement used by Mechon L'Hoyroa. *Id*. In that document the parties agreed to "settle all our controversies (including all the Parties' claims and counter claims)" before Mechon L'Hoyroa. ECF No. 20-3 at 9. Kryman handwrote an additional clause at the bottom of the agreement, which specified that there would be a "first hearing" at which it would "be determined whether the parties are obligated to bring their dispute for litigation in accordance with the law of the Torah." *Id.* Neither party disputes that this addition is part of any agreement.

The parties appeared before Mechon L'Hoyroa twice. Jalas alleges that at the first appearance, Kryman refused to produce the original copy of the arbitration agreement or to sign a new copy. ECF No. 20-3 at 3. The arbitrators declined to resolve any disputes because they were unsure whether courts would enforce an arbitral decision reached absent an original copy of the arbitration agreement and suggested that the parties return for another session and negotiate a new agreement. *Id*. At the second session, Kryman proposed a new arbitration agreement that Jalas refused to sign both because he thought it was unfair and because he continued to believe that the original agreement was binding on Kryman. *Id*. The arbitrators

issued a notice that a hearing had been held but that "no arbitration agreement was signed before the court at that time." ECF No. 21-18 at 4.

The parties then attempted arbitration using the *zabla* procedure, which allows parties to create an ad-hoc *beth din* by selecting two arbitrators who together appoint a third. ECF No. 20-3 at 4. At the only session of the *zabla* panel, Kryman presented the same draft arbitration agreement Jalas had earlier refused to sign, Jalas declined again, and the arbitration stalled. ECF No. 20-3 at 4; ECF No. 21-9 at 9. Kryman then moved to reopen the TTAB proceeding, telling the board that despite his earlier statements, "no agreement to arbitrate was ever executed by the parties and no formal hearings were commenced." ECF No. 21-2 at 3. When Jalas did not respond, the TTAB resumed the proceeding and set a new schedule. ECF No. 21-3 at 3. Jalas now moves the court to compel Kryman to arbitrate under the arbitration agreement signed in 2017.

## **DISCUSSION**

### I. *Legal Framework*

The Federal Arbitration Act (FAA) "declare[s] a national policy favoring arbitration." *Perry v. Thomas*, 482 U.S. 483, 489 (1987) (internal quotation omitted). This policy is grounded in "a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012). The FAA "places arbitration agreements on an equal footing

5

with other contracts . . . and requires courts to enforce them according to their terms." *Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010) (internal citation omitted). Parties to a covered "written agreement for arbitration" may petition federal courts for an order directing arbitration under that agreement. 9 U.S.C. § 4.

The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). A court must therefore ask "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "Whether or not the parties have agreed to arbitrate is a question of state contract law," *Schnabel*, 697 F.3d at 119, but federal policy requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *In re Am. Exp.*, 672 F.3d at 128.

The parties agree that New York contract law applies. "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *26th St. Partners, LLC v. Fed'n of Orgs. for N.Y. State Mentally Disabled, Inc.*, 182 A.D.3d 543, 543 (2d Dep't 2020). Courts will "look to the basic elements of offer and acceptance to determine whether there is an objective meeting of the minds sufficient

to give rise to a binding and enforceable contract." *Id.*; *see also Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). A meeting of the minds is shown by the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 368 (2005) (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977)). "[T]he existence of a binding contract is not dependent on the subjective intent" of either party. *Brown Bros.*, 41 N.Y.2d at 399.

The standard for resolving a motion to compel arbitration is similar to the summary judgment standard. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). That means a court must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" and "draw all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation and alteration omitted).

    II. *Jalas and Kryman agreed to arbitrate*

Jalas attached a Hebrew copy and certified English translation of the November 2017 agreement to his motion. *See* ECF No. 20-3 at 8–10. As noted above, the agreement provides that the parties will "settle all our controversies (including all the Parties' claims and counter claims)" before Mechon L'Hoyroa. *Id.* at 9. The handwritten provision provides that "[a]t the first hearing it will be

7

determined whether the parties are obligated to bring their dispute for litigation in accordance with the Law of the Torah." *Id.* Kryman does not dispute the authenticity of this document, but he argues that it does not constitute a valid agreement to arbitrate.

None of Kryman's arguments are persuasive. His fundamental objection is that he claims he signed a boilerplate "agreement to agree" that he "never understood nor intended . . . [to be] a delegation of authority to Mechon L'Hoyroa to decide any threshold or substantive issues." ECF No. 21-9 at 6. Kryman alleges that he thought the document was "an agreement to meet and discuss whether and under what conditions the parties would or could agree to voluntarily arbitrate their disputes." *Id.* However, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing," *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002), and the document Kryman signed unambiguously commits the parties to "settle all [their] controversies (including all the Parties' claims and counter claims)" before Mechon L'Hoyroa, provided that the arbitrators first determine that "the parties are obligated" to do so. ECF No. 20-3 at 9. Kryman's subjective understanding of the situation cannot defeat his objective manifestation of assent to the agreement's plain language. *See Brown Bros.*, 41 N.Y.2d at 399; *see also W.W.W. Assocs., Inc. v. Giancontieri*, 77 NY.2d 157, 162 (1990) (holding that "[e]vidence

8

outside the four corners of the [contract] as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.").

Kryman next argues that the agreement is not "sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." ECF No. 21 at 21 (quoting *Medrite Care, LLC v. Medrite 243 LLC*, 2020 WL 3962010, at *2 (S.D.N.Y. July 13, 2020)). Kryman's attempt to liken his case to *Medrite* fails. The parties in that case agreed that they did not have a written agreement for arbitration before the lawsuit began, but they also agreed that Jewish law obligated them to attempt arbitration. *Medrite*, 2020 WL 3962010, at *3. The defendant in that case asked the court to construe the parties' representations about their religious obligations in court papers as forming an agreement to arbitrate, but the court declined to do so both because the parties could not agree on a specific forum and because the purported offer and acceptance were not clear and unequivocal. *Id.* at *2–3.

Here, the parties have a written agreement to arbitrate. That agreement specifies the forum — Beth Din Mechon L'Hoyroa — and there is no issue of offer and acceptance because both parties signed the agreement. The only indefiniteness Kryman points to is the wide sweep of matters to be arbitrated, but an agreement to arbitrate can be both broad and definite in its scope. Parties are free to delegate "all the disputes between them" to an arbitrator, *Matter of Meisels v. Uhr*, 79 N.Y.2d 526,

9

532 (1992), and the Court of Appeals has explicitly affirmed that these types of agreements, "which apparently are widely used in Beth Din arbitrations . . . are permissible" under New York law. *Id.* at 538.

Kryman also argues that the handwritten provision conflicts with the broad statement of scope in the body of the document, rendering the arbitration agreement as a whole ambiguous and unenforceable. Ambiguity of a writing "is a question of law to be resolved by the courts," *Giancontieri*, 77 N.Y.2d at 162, and, as noted above, I find no ambiguity in the agreement. The parties agreed to "settle all [their] controversies" before Beth Din Mechon L'Hoyroa. ECF No. 20-3 at 9. Kryman claims that this language is inconsistent with his handwritten addition, which says that "[a]t the first hearing it will be determined whether the parties are obligated to bring their dispute for litigation in accordance with the Law of the Torah." ECF No. 20-3 at 9.

The handwritten language directs the arbitral panel to first answer the "gateway question[]," *Rent-A-Center*, 561 U.S. at 68–69, of "whether the parties are obligated to bring their dispute for litigation in accordance with the law of the Torah." ECF No. 20-3 at 9. If the answer is yes, then Mechon L'Hoyroa will serve as the forum for arbitration under the agreement. If the answer is no, then the parties are presumably free to pursue other means for resolving their dispute. That reading is the only one to which the language is "reasonably susceptible," *Greenfield*, 98

N.Y.2d at 570, and thus the agreement is not ambiguous. Kryman argues that the handwritten addition shows that the parties intended that Mechon L'Hoyroa would merely facilitate a discussion about possible arbitration, but that interpretation cannot be squared with the mandatory language used in the agreement. A mere discussion does not typically "determine" whether participants "are obligated" to do anything. ECF No. 20-3 at 9. The agreement "'clearly and unmistakably' delegates the issue of arbitrability to the arbitrator," and that delegation is enforceable. *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (quoting *Rent-A-Center*, 561 U.S. at 69 n.1).

Kryman also claims that there was no mutual assent because he signed the agreement "against the backdrop of coercive behavior by Jalas," who threatened him with a *seruv*. ECF No. 21 at 17. A *seruv* "subjects the recipient to shame, scorn, ridicule and public ostracism by other members of the Jewish religious community." *Lieberman v. Lieberman*, 566 N.Y.S.2d 490, 494 (N.Y. Sup. Ct. 1991). Kryman asserts the threat was intentionally made while he was in Israel to attend his son's wedding — when the potential for disruption and embarrassment within the community was highest — and I draw that inference in his favor. *See* ECF No. 21 at 17.

Although Kryman styles this argument as going to mutual assent, it is effectively duress in disguise. "In the absence of fraud, duress, or some other

wrongful act by a party to a contract, a signer of an agreement is deemed to be conclusively bound by its terms." *Maines Paper & Food Serv. Inc. v. Adel*, 256 A.D.2d 760, 761 (2d Dep't 1998). Duress requires a "showing of a wrongful threat and the preclusion of the exercise of free will." *Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 14 A.D.3d 352, 352 (1st Dep't 2005). "The 'threat' of a siruv . . . is prescribed as an enforcement mechanism by the religious law to which [Kryman] freely adheres, [and] cannot be deemed duress." *Greenberg v. Greenberg*, 238 A.D.2d 420, 421 (2d Dep't 1997); *see also Lieberman*, 566 N.Y.S.2d at 494 ("While the threat of a Sirov may constitute pressure, it cannot be said to constitute duress."). Even if Jalas sought to exert maximum pressure on Kryman, that action does not constitute duress as a matter of New York law.

III. *The agreement covers this dispute*

When asking whether a dispute comes within the scope of an arbitration agreement, courts must apply a "presumption in favor of arbitrability." *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019). The broad arbitration agreement in this case covers "all [the parties'] controversies (including all the Parties' claims and counter claims)," ECF No. 20-3 at 9, and that language reaches the party's current disputes.

IV. *Jalas has not waived his right to arbitration*

Kryman argues that even if the arbitration agreement is binding and covers this dispute, Jalas has waived his right to enforce it by refusing to arbitrate in 2012, rejecting his draft agreements in 2017, and litigating before the TTAB. "Waiver will be inferred when a party engages in protracted litigation that results in prejudice to the opposing party," *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993), or otherwise "act[s] inconsistently with the right to arbitrate." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 981 (2d Cir. 1996). "The key to a waiver analysis is prejudice" to the party opposing arbitration. *Thyssen, Inc. v. Calypso Shipping Corp.*, 310 F.3d 102, 105 (2d Cir. 2002) (*per curiam*); *see also Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992) (holding that prejudice to the other party is "the touchstone" for waiver analyses). "[A] party claiming waiver must demonstrate prejudice before waiver will be found." *Schreiber v. Friedman*, 2017 WL 5564114, at *7 (E.D.N.Y. Mar. 31, 2017).

Prejudice may be (1) substantive, "such as when the party seeking arbitration 'loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration,'" or (2) result from the "unnecessary delay or expense" caused "when an opponent delays invocation of its contractual right to arbitrate." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997) (quoting *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991)). Substantive prejudice can occur when

the party seeking arbitration "obtains information through discovery procedures not available in arbitration," *id.*, or litigates "substantial issues going to the merits" before seeking arbitration. *Com-Tech Assocs. v. Comput. Assocs. Int'l, Inc.*, 938 F.2d 1574, 1576 (2d Cir. 1991). Although waiver is "fact-specific and there are no bright-line rules," *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998), determination of the issue must be made "with a healthy regard for the policy of promoting arbitration," *Distajo*, 107 F.3d at 130, and waiver is "not to be lightly inferred." *Cotton*, 4 F.3d at 179 (internal quotation omitted); *see also Hoxworth*, 980 F.2d at 926 (noting that "waiver is not favored"). Any doubts concerning waiver must be resolved in favor of arbitration. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 229 (2d Cir. 2001).

Kryman has not shown that Jalas has waived his right to arbitrate. First, Kryman has not shown that Jalas engaged in "protracted litigation." *Cotton*, 4 F.3d at 179. The Supreme Court proceeding — which Kryman, not Jalas, filed — was dismissed well before either party "sought and received discovery," *Baker & Taylor, Inc. v. AlphaCraze.Com Corp.*, 602 F.3d 486, 492 (2d Cir. 2010), or filed any "substantive motions," *Thyssen,* 310 F.3d at 105, much less motions "going to the merits" of the dispute. *Com-Tech*, 938 F.2d at 1576. The case was dismissed at an early stage because the parties had agreed to arbitrate on a "narrow" set of issues, ECF No. 21-9 at 3 ¶ 14, but that arbitration never took place — at least in part

because Kryman "decided to set the matter aside." *Id.* ¶ 18. Nor has Kryman submitted evidence that the parties conducted discovery, substantive motion practice, or any other type of "extensive litigation," *Dreyfus*, 252 F.3d at 229, in the TTAB proceeding, either before or after it was stayed based on Kryman's own representations that the parties had agreed to arbitrate.

The examples of non-litigation actions that Kryman presents as inconsistent with a right to arbitrate are unpersuasive.[3] He claims that Jalas refused to arbitrate in 2012, when Kryman issued a *hazmana*. But Kryman issued that summons before the parties had executed any arbitration agreement — even the first, narrower one. *See* ECF No. 21-9 at 3 ¶ 9. Jalas's decision not to arbitrate on Kryman's terms before the two had reached an arbitration agreement has little bearing on waiver. These

---

[3] There is some suggestion in the cases that questions of waiver should be decided by the arbitrators — rather than by a court — unless "the waiver defense was based on prior litigation by the party seeking arbitration." *Doctor's Assocs. Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir. 1995); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (stating in dicta that "the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability") (internal quotation and alteration omitted); *Schreiber*, 2017 WL 5564114, at *8 (discussing when courts should decide questions of waiver); *Canada Life Assur. Co. v. Guardian Life Ins. Co. of Am.*, 242 F. Supp.2d 344, 353 (S.D.N.Y. 2003) (deciding waiver question based on pre-litigation conduct). That rule would require me to decide Kryman's waiver claims based on Jalas's participation in litigation, but refer those claims rooted in non-litigation conduct to Mechon L'Hoyroa. Because Jalas does not argue that waiver must be decided by the arbitrators (and indeed does not discuss the issue at all), I decide all the waiver claims together.

15

agreements are "matters of contract," *Am. Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013), and a party to a contract "may not waive any right it does not yet have" as a result of contract formation. 13 Williston on Contracts § 39:19 (4th Ed. 2021); s*ee also Kule Res., Ltd. v. Reliance Grp., Inc.*, 49 N.Y.2d 587, 592 (1980) (stating that "the concept of prior waiver is legally anomalous"); *cf. Lane, Ltd. v. Larus & Bro. Comp.*, 243 F.2d 364, 365–67 (2d Cir. 1957) (finding that a party's refusal to arbitrate certain issues under an agreement was "an express and intransigent repudiation of the obligation to arbitrate" that barred it from enforcing *the same* arbitration agreement in a later lawsuit).

For the same reason, Jalas did not expressly waive his right to arbitrate by stating in the 2012 agreement that Kryman's claim "ought not to be entertained in a Jewish court, since he pursued it in the civil courts." ECF No. 21-13 at 5. That agreement is not the one Jalas asks me to enforce in this case, and both he and Kryman were entitled to change their positions on arbitration before concluding a new agreement in 2017. Even if, as Kryman alleges, Jalas "refused to appear" under the 2012 agreement, ECF No. 21-9 at 4 ¶ 17, that is not enough to show waiver under the 2017 agreement. If Kryman felt that he was prejudiced by the litigation the parties had already undertaken by 2017, he was free to refuse to sign a new arbitration agreement at that time.

Nor did Jalas waive his right to arbitrate by refusing to consider Kryman's offers to conclude a new arbitration agreement. Jalas's position was (and is) that the 2017 arbitration agreement was valid and binding. Standing on his "right to insist upon arbitration," *Baker*, 602 F.3d at 490, under that agreement — rather than entertaining offers to replace it with an entirely new one — weighs against waiver, not in favor. *See Zhang v. Wang*, 317 F. App'x 26, 28 (2d Cir. 2008) (holding that waiver requires conduct "which reflects a positive and unequivocal election to ignore his or her arbitration rights").

Jalas never refused to arbitrate under the agreement he now seeks to enforce, which is what distinguishes this case from *Schreiber*. *See* 2017 WL 5564114, at *9. In that case, the party seeking to compel arbitration had previously been summoned under the same agreement but unjustifiably "refused to participate in the arbitration proceedings." *Id.* at *10; *see also Canada Life*, 242 F. Supp.2d at 353 (explaining that the Second Circuit has found waiver where "[t]he issues defendant requested to be referred to arbitration were precisely the same issues that he previously refused to arbitrate" and those issues "were clearly covered by the arbitration clause."). Simply showing that a party refused to consider arbitration in some way, at some time is not enough to establish that it has waived its rights under a particular agreement.

Finally, even if Jalas's conduct was inconsistent with his right to arbitrate, Kryman has failed to make the "key" showing that it prejudiced him, an issue on which he bears the burden. *Thyssen*, 310 F.3d at 105; *Schreiber*, 2017 WL 5564114, at *7. Kryman argues that he "would be prejudiced if this motion [to compel arbitration] is granted" because, among other things, it would delay resolution of the TTAB proceeding. ECF No. 21 at 27. Prejudice flows from the "inherent unfairness . . . that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue," but it "does not refer to enforcing a bargained-for agreement." *Louis Dreyfus*, 252 F.3d at 229–30. The question is whether Jalas's past conduct so prejudiced Kryman that Jalas should now be barred from asking a court to compel the parties to arbitrate. Whether Kryman would be inconvenienced by an order forcing him to arbitrate is immaterial, even if he has good reasons for preferring a court proceeding. "Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver." *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103 107 (2d Cir. 1997).

Kryman's discovery argument also misunderstands the prejudice analysis. He claims that he will be prejudiced "by having to appear and arbitrate before a Beth Din that will likely not permit . . . formal exchange of discovery [or] commissioning [of] stenographers," which would be available in a court proceeding. ECF No. 21 at

18

27. Prejudice is caused when the party seeking to compel arbitration "secure[s] for himself the benefits of pretrial discovery that is often unavailable in an arbitral forum." *Cotton*, 4 F.3d at 180. In other words, a party may not reap the benefits of compulsory discovery and then force the case into arbitration with those materials in hand. *See Zwitserse Maatschappij Van Levensverzekering En Lijfrente v. ABN Int'l Cap. Mkts. Corp.*, 996 F.2d 1478, 1480 (2d Cir. 1993) (holding that the party opposing arbitration "suffered prejudice because the deposition-type discovery obtained [by the party seeking to compel] . . . would not have been available in [] arbitration.").

Kryman seeks to turn the doctrine inside out by claiming that he, as the party opposing arbitration, would be prejudiced if he is deprived of the discovery tools available in a court. But again, the inquiry must focus on unfair prejudice caused by Jalas's past conduct, not the possibility that arbitration could disadvantage Kryman in the future. Kryman is not prejudiced by the prospect of arbitrating under an agreement he signed simply because he would now prefer to litigate in court. If changing one's mind about arbitration down the line were enough to establish prejudice, then precious few arbitration agreements could ever be enforced. Federal policy points in the other direction.

## CONCLUSION

Plaintiff's motion to compel arbitration pursuant to 9 U.S.C. § 4 is granted.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
July 6, 2021

Edward R. Korman
United States District Judge